Case number 23-1333. El Puente de Williamsburg, Inc. and LACI Latino de Accion Climatica et al. Petitioners versus Federal Energy Regulatory Commission. Mr. Shagnon for the petitioners, Mr. Schanger for the respondent, Mr. Marwell for the intervener. Good morning, whenever you're ready. Good morning, your honors, and may it please the court. Ben Shagnon on behalf of the community organization petitioners. I'd like to three minutes for rebuttal. Petitioners are here today because just over 20 months ago, NFE asked FERC to disregard the core requirements of the Natural Gas Act in NEPA when it sought emergency approval to build and operate a 220-foot pipeline that expanded its still unauthorized terminal. Congress intended that before FERC authorized any construction or operation of a jurisdictional pipeline, first must look before it leaps, conducting the environmental and public interest review. But here, FERC allowed NFE to go forward without that, accepting NFE's proposal to build first and conduct comprehensive review later. Congress did not authorize FERC to grant that kind of interim approval, and the court should set its orders aside. But I'd like to focus my time this morning on FERC's efforts to shield its unlawful orders from judicial review. I'll start with FERC's Heckler argument and then turn to its finality argument. There are two independent ways to resolve the Heckler argument in our favor. First, the court should not read FERC's order to contain any act of enforcement discretion, and second, even if it does, this court can and should say that FERC exceeded the discretion Congress gave it under the Natural Gas Act. I'll start with the argument that FERC's order should not be read to encompass any enforcement discretion. That's clear from the text of the order itself. It describes what NGE asked for as temporary authority to operate, and it ultimately allows the immediate construction and operation of the proposed facilities. It's clear that it's intending to approve the construction of the pipeline, because when it talks about what it will do going forward, it's only going to look again at the question of whether continued operation is okay. That's all at JAA 114 and 115. So on JAA 114 and the paragraph of explanation, it also says, we will not take action to prevent the immediate construction and operation of the proposed facilities. What action are you saying they should have taken instead? Certainly, Your Honor. What we're saying they should have taken instead is to not have that sentence. It should say, we can't approve this right now. We're going to review it as we are required to under the Natural Gas Act in NEPA. But in the interim, you are not allowed to operate the pipeline. And the way they would effectuate that would be to seek an injunction, right? They wouldn't need to seek an injunction. The context in which this comes up is NFE had not started building and operating the pipeline. They come to FERC with an application. This is on July 18th. And that says, we recognize that for the facility itself, you've given us temporary authorization. We'd like the same treatment for the pipeline. So in that context where NFE comes to FERC and says, we'd like temporary authorization, what we'd expect FERC to do is approve or deny a request for temporary authorization. It has it both ways. FERC says, we don't have authority to do this, but we're effectively going to give you temporary authorization anyway. Just one clarifying question. You said they granted temporary authorization for the terminal. That's right. Wouldn't they not have authority to do that since there's no temporary authorization authority in section three? I read the show cause order to say what this one did, which is we're not going to take action to stop you in the meantime. That's correct, your honor. The position we're taking here would also apply to the terminal. The reason that that didn't come to this court is no one challenged that aspect of the show cause order. But I agree with you that the Natural Gas Act contains no authority to offer temporary authorization of a section three project. That's in contrast to under section seven. So you have 717 FC1B, which does have temporary emergency approval. FERC could not authorize that here. And that contrast with what's in section three goes to show that FERC simply didn't have the authority. Okay. So then if that's the legal backdrop and FERC says, we are not yet ready to authorize, give you the certificate, there's no authorization. And then they say, but we're not going to do anything about it. What could that be other than enforcement discretion? So in the context of resolving an application, we think it's strange to read the order as invoking enforcement discretion. In all of the cases FERC and NFE cite in their briefs, those are contexts where FERC is expressly asked to enforce against someone, and then it declines to exercise enforcement discretion. In this context, all FERC is going to be asked, and that's under 717BE, is to adjudicate an application. And under this court's case in Burlington, there's a clear distinction between when FERC acts as an authority. The key reason not to read the order to invoke enforcement discretion is that FERC was never asked to do that. Fair point, but there's no reason why they could not invoke enforcement discretion in the context of an order either refusing authorization or deferring the authorization decision. That's right. I mean, it's unusual, but there's an emergency on the issue. Post Maria, people didn't have power for a year, so of course they're going to worry about what's happening in the interim. A couple of responses, Your Honor. So you're right that they absolutely could invoke enforcement discretion. That would run them headlong into our second argument, which is that even if there is a clear invocation of enforcement discretion here, they've exceeded the discretion. But the second point is exactly what you said, which is they've taken an order that's perhaps not a model of clarity about what they were doing, and now for the first time on appeal saying, oh, this was a clear invocation of enforcement discretion. So the way we would take that order is to say that absent that clarity, this court shouldn't impose a very strict and harsh penalty of making an order not judicially reviewable. As this court and the Supreme Court have made clear, this is supposed to be a narrow exception to judicial review, and if FERC wants to take advantage of that and shield its order, it should invoke enforcement discretion clearly. That's what it's done in prior orders, so including the two that FERC cites, the prelude order and the Greenfield order, both of those clearly on their face say, this is an act of enforcement discretion. We're not going forward. And when you look at this court's cases dealing with acts of enforcement discretion, you see that it singles out or distinguish those circumstances where the agency was acting as an adjudicator. So in the sharing case that NFE cites, in footnote 19, the court makes clear, this isn't a context where someone had to come to approval for us first, so that's why it's so easy to see this is an act of enforcement discretion. So I take your Honor's point that this order isn't a model of clarity, but in the context of the ambiguity that we have and how everyone's proceeded since then, it doesn't make sense to read it or reach out to read it as an act of enforcement discretion. Mr. Shiner, what would you have the court do exactly? We'd have the court vacate the order. Where are you if we vacate the order? So our view is that the order does approve interim or temporary authorization of the facility. The court vacates the order, that leaves no temporary or interim authority on the books. I think FERC agrees with you, there's no temporary authorization. If FERC agrees with us on that, then... If they've said we just decided to take no action, I think it follows that therefore there is no temporary authorization in effect. So we agree with you that that would be a potential way to read the order. The reason this court should vacate it as an authorization is for the reason Commissioner Danley says, the nature of FERC's order makes the situation a bit of a mess and chaos. And from NFE's perspective, they're holding out this order, they're going to their shareholders in their 10K, they're going out into the world saying, we do have approval, we have authority to operate this. That may be, but they may be misrepresenting what they've got or it may be so confusing that they're simply confused about what they've got. But let's read the order however you want. What would you have us do? Vacate this confusing order and then what happens? So then it goes back to FERC for it to explain. So you're telling us we have to order them to explain something? Not at all, Your Honor. So we... We don't have to explain, we just vacate the order. We vacate the order, the approval goes away, NFE can decide to violate the law if it would like, but otherwise FERC will proceed on the current proceedings. Or FERC can say, we're not going to take enforcement action given the urgent emergency on the ground. It might say that, we think that would run into the second problem we mentioned in terms of the constraints on their enforcement discretion, so I'll touch on that briefly, which is that under the Natural Gas Act, the structure and in comparison to Section 7 makes clear that FERC simply does not have the authority to grant emergency or interim authority to operate or build a pipeline. That's clear from Section 717 BE1, 2, and 3, which make clear that FERC's authority is to approve or deny. We've spotted you that. We're over that point for purposes of this exchange. There's no authorization and FERC says there's an urgent emergency on the ground, and we choose not to enforce the requirement while we dot our I's and cross our T's on NEPA. Certainly, Your Honor, so I think this Court's decision in Baltimore Gas and Electric becomes helpful there where it makes clear that there is a hard constraint on FERC's ability to grant or allow a pipeline to be built and operate and operated as a matter of enforcement discretion, so it's not the case that once the heckler bar applies that there can be no inquiry. Presumption applies that there can be no inquiry into the constraints on the discretion that FERC enjoys, and the statute here does make clear that FERC is pretty limited in what it can do in terms of whether or not to authorize a project. What the Baltimore Gas opinion says right after the portion you've highlighted is, but the statute is utterly silent on the manner in which the commission is to proceed against a particular transgressor, and when I think about that question, although it's a little bit odd nobody's raised this, so maybe I'm missing something, 717S is the enforcement authority, and it is incredibly clear that that is entirely discretionary with the commission, right, and that sets out what the commission shall do when it appears that any person is about to engage in an act that will constitute a violation. That's the case on everyone's view of it, and it's entirely within their discretion to take action to stop the project. So what's the answer to that? So two answers, Your Honor. The first is that given the clarity of that provision, you'd expect FERC to invoke their discretion, that at least in the context of delivering the order, they haven't, they've never been able to point to anything in their order saying that they have. But the second answer is that it cannot be the case that FERC can use its discretion to grant backdoor approval on an emergency basis that Congress did not intend them to have. FERC has well articulated regime about when it can grant emergency approval. You're coming back to authorization. Let's just talk about enforcement discretion. That's right. And the government doesn't have to prosecute every crime it identifies in the world. That's right, Your Honor. So I will focus on the first argument we have, which is that in the context of an application to build and operate a pipeline, it simply makes little sense to read FERC as engaging in a preemptive act of enforcement discretion. It's a strange thing for it to do, and we would ask this court not to stretch to read its order that way. This is all coming in the backdrop of the court's decision in Allegheny just five years ago, where the court made clear that FERC should not be allowed to play games with how it frames its orders to escape judicial review. And this feels like an other example of that kind of thing. Let me ask you about the Burlington case. Does FERC operate as many other regulatory agencies do by having the staff prosecute the case against the regulated company and FERC sits as the adjudicator? That's my understanding, is that there is FERC staff that can initially recommend enforcement. That's the ordinary way the utility regulation is set up. Right. So the staff, when they operate as the enforcement voice of the agency, they are engaged in enforcement and the commissioners, the five commissioners, are engaged in adjudication. So how is an order sent to the commission saying, following your request, that they own up to what they're doing, that this order isn't sufficient? Surely that goes to the enforcement arm of the commission, doesn't it? I think you're right. Speaks to the commission in its enforcement capacity. I think you're right, Your Honor. Not in its adjudicatory capacity. That this kind of wearing two hats role that FERC has is another reason that it should be particularly clear in terms of which hat it's wearing when it speaks. Everything you'd have that FERC is resolving up until FERC's brief on appeal has it in the context of resolving or adjudicating an application for building and operating a pipeline. It's only on appeal that actually we're wearing both hats at once. You might not have realized that, but now we're telling you that. So I think it's the fact that they do wear these multiple hats that requires clarity here. Seems to me that that's what defeats clarity, what makes it unreachable. The Burlington distinction is not helpful to you or the court. So I think it's helpful in the first instance because they're acting as an adjudicator. They're receiving an application that has this. And in response to that application, 717B-82. Receiving an application and the staff acts on the application. Correct. And there's no role for enforcement discretion to play in the first instance. What FERC would have had to engage with here is a preemptive exercise of enforcement discretion. I'm having trouble breaking what appears to be a circle here, which is that if we say what you did is invalid, but we can't say you have to do something else because of head clerk constraining. Whether we talk about it at the front end or the back end on a remedy necessary for standing, mediability, redressability, that comes back to chain either way. So you're right, your honor, to the extent that ambiguity is the best we can get. We think the order should still go back to FERC so they can make this clear. You may be right that in the end, they'll exercise their enforcement discretion more clearly and that will prove an uphill battle for us to get around given Judge Garcia's point about what the statute says about complaints and your point about maybe they would be wearing two hats, but right now the order is not. What you're saying is we can't really remedy your cause. We think it would remedy our cause because right now we are reading this as encompassing an approval of the facility. It depends upon getting a remedy and any remedy short of removing that pipeline is not a remedy at all. So just to clarify, we don't need to remove the pipeline? Or deactivate it. If they could stop the operation of the pipeline, that would help our members. Short of that, you get nothing. That's right, that's what we're seeking. And that's what we cannot order. We're not asking you to order NFE to stop operating directly. We're asking you to vacate an order which gives them authority to operate and that should be sufficient for standing purposes. Well. I'd be a very unhappy plaintiff if I were you and I got that order. We'll give you someone. Thanks. All right, we'll hear from FERC. Mr. Shainer. May it please the court, Houston Shainer for Respondent Federal Energy Regulatory Commission. I'd like to start with Judge Garcia's first question. I think that largely resolves this case. If you don't read the phrase, take no action to prevent the construction operation of the connecting line as an act of enforcement discretion, how else can you read it? My colleague makes heroic effort, but there's no response in that in terms of a counter the only plausible reading of that phrase, or at least the most sensible reading of that phrase is as an enforcement declination. That's clear from the case law starting all the way back in the 1980s with Heckler v. Cheney. The Supreme Court notes that the FDA refused to take action to prevent unlawful conduct. That is an enforcement action. It is true that some cases like Heckler v. Cheney also used the modifier enforcement in front of action, the term action. But if you were to take out the word enforcement, no one will be confused that that was an enforcement declination in that case. And in other cases like Sierra Club v. Jackson, or in decisions like Prelude, a decision not to act is implied and understood as a decision not to take enforcement action. I believe that's certainly clear. Happy to take the court's questions on that. In FERC's view, is this line operating lawfully at the moment? No, the commission did not authorize this line, but the commission is not taking action to prevent any unlawful operation. Then my other question is just as a practical matter, what is different right now between what these orders do and an affirmative temporary authorization, assuming you had that authority? What are the risks they're facing? Certainly a good question. I think a formal authorization would be more durable and indefinite. Obviously, the connecting line could operate more or less in perpetuity until the authorization was revoked, and there would have to be certain procedures to revoke that authorization, assuming, of course, it survives judicial review. But that would greatly reduce the risk to the pipeline company. In contrast here, there's an enforcement decision out of the gate. The commission can withdraw that at any time. Nothing stops the petitioners from coming back to the commission and say, hey, you misunderstood some of the facts on the ground, or the circumstances have changed. Reconsider the exercise of your enforcement discretion, and perhaps the commission would do that. And even if the commission didn't do that, this situation has an ongoing formal docket in which the commission will make a merits determination on the legal status of both the terminal and the connecting line that will either grant or deny formal authorization, and then they will have potentially full relief for the plaintiffs here and potentially a huge risk to the pipeline company to continue operating at that point. Is that ongoing? Yes, it's very active. I believe there are filings as recent as either last week or yesterday. And I would also point you to the red brief. You have a compelling story on the emergency, but, I mean, it's been four years on the terminal itself. For the terminal, that is true. It's obviously not four years to connecting the line and the connecting line to change things to some degree. But the commission takes its job very seriously under Section 3, and this is very highly technical information in which we have to make sure that we go through a wide variety of information and consider everything relevant to public interest. And if your honor is concerned about the process, I would point you to red brief pages 18 and 19, the subsequent development section statement of case. We cite the commission's notice of intent to repair an environmental impact statement for the combined docket. There you'll see a schedule for environmental review, which estimates a final order in this docket, I believe February 2026, with a draft environmental impact statement, a planning assumption of a draft environmental impact statement, I believe, May of this year. The court can certainly check that schedule again. I'm doing this from memory. But obviously, the commission has made a lot of progress in the docket already and has continued to make progress. And this is a little bit unusual in that, rather than having a fully formed and sort of very deliberate application and very complete application up front, the commission had to sort of take the terminal from the beginning and then withdraw a sort of pull information from NFNRG in real time. So that certainly means that there are a lot of things like information requests that the commission has to send out to gather further information. It's at least odd that section seven does provide for emergency temporary authorizations and section three does not. Do you have any understanding of why that is? Unfortunately, I cannot tell you exactly. I do know, as you'll see in footnote five of the original order, the commission has regulations allowing the sort of emergency reconstruction of section three facilities. I can only speculate, but it may be somewhat related to the sort of split authority between the Department of Energy and FERC. We have authority over the siting facilities, but not necessarily the export of natural gas. All right, thank you for your time. Thank you. Mr. Marwell. Good morning, Your Honors. Jeremy Marwell for the intervener, NFNRG LLC. Just a few quick points. First, in form and in substance, we think the orders here can only be read as a decision by FERC not to exercise its enforcement discretion to stop the construction or operation of a pipeline that is frankly quite needed to keep the lights on in Puerto Rico. The context that we came to the commission asking for an approval does not dictate that everything that the commission did in response to that request is an approval, and the reality is we did not get everything we asked for initially. We asked for an authorization, and we got the order that said that we will consider that later, but for now, the sentence that we will not take action to immediately stop construction or operation. A few other cleanup points. With regard to the public statements by our company about what we received, I think the petitioners cite to a 10-K, which, of course, is not a legal brief. It's a more practical document meant to disclose to the market, and the reality is we had to make a risk-informed decision when we got this order, and we did move forward, and we've been able to operate the pipeline. The petitioners briefly, there was some brief discussion about whether the same theory would apply to the terminal, the facility as a whole. This case only involves the 220 feet of pipe. I think as petitioners can see, nobody on their side appealed that temporary order, so I don't think you would say anything about the terminal as a whole. Hopefully, the court will not get to remedy, but if you did get to remedy, we would urge you to leave that to the commission in the first instance and not take any action by this court that would interrupt operation of that line. Unfortunately, it remains urgently needed. Progress is being made, but the situation is still quite tenuous, as you can see from the sites in our brief and reports by the LUMA, which is the entity responsible for the distribution and transmission of electricity in Puerto Rico. So unless there are any other questions, we'd ask that you... Is it correct as a factual matter that the company didn't start building the line until it received this order? That is my understanding. We did not build until we received the order. But you actually requested an order.  And that... How long did it take between your request and this decision? So this starts at JA1. July 18th, 2023 was the letter... The decision, July 31st or so. Correct. So the first order, the commission's initial order was July 31st. So they did act quite promptly. We asked them to act very promptly. The context that the record shows was that hurricane season was coming and this temporary electric generation that is enabled by this pipeline was necessary to try to harden the system against the incoming hurricane season. And the commission independently verified that also in the record with direct communications to the Army Corps, which was the agency tasked by the inter... The federal government interagency task force with trying to come up with very expedited ways of putting more generation assets on the system. So yes, it was very quickly, but we did not start until we got the order from the commission. Thank you. Thank you very much. Jack, now on rebuttal. Thank you, Your Honor. So I have two points on rebuttal. I'd like to start with Judge Garcia's question to my friend on the other side, which is just to repeat that you heard the government concede that there's functionally no difference between what this order does in granting an interim approval. And you can imagine FERC taking that authority and using it in all sorts of contexts. There would be nothing stopping it if this court were to rule for FERC here from FERC saying, we actually think this is against the public interest, but we're going to let you do it anyway. We don't want to do any purview at all. No, we're supposed to, but we don't want to, but you can go forward anyway. The second point I would like to emphasize is that is how to think about whether this is an emergency. So the first aspect of the emergency is that the same citations my friend from NFE mentioned indicate that they knew as early as April of that year that they would need to apply to FERC for this kind of authorization. That's what spun up this project to begin with. They waited until just a few days, a few weeks before they needed to get going. So it's an emergency of their own making in part. But second, I also want to emphasize that the nature of this emergency has shifted over time. Originally, they come to FERC and they say, this is for the upcoming hurricane season. This pipeline's now been operating for one more hurricane season, and we're about to enter another one. And in the same materials that my friend from NFE cites, they make clear that the reason that these facilities are needed has changed. It used to be that it was for hurricane season, but in the last year, PREPA, which is the Puerto Rico utility agency, came forward and said, we need to take control of these because these are now important for our purposes overall. So there's a shifting nature of the emergency over time that underscores that it's not totally clear from the record here exactly why this pipeline is needed, and that has shifted over time. And the last point on emergency is that the initial request, and this isn't fully developed because FERC hasn't analyzed it yet, but the initial request was that it was important to get this facility for hurricane season, but the record shows, and this is at JA39, that the problem with Puerto Rico's electricity problems has to do with the grid and not a lack of centralized generation, and all this provided was centralized generation. So we'd ask this court to vacate the orders. Okay. Thank you, counsel. Thank you. Thank you all, counsel. The case is submitted.
judges: Katsas; Garcia; Ginsburg